RHODES *v.* STATE OF INDIANA.

[No. 25,235.    Filed April 27, 1927.]

1. CRIMINAL LAW.—*Writ of coram nobis, when proper.*—The writ of *coram nobis* is not intended to authorize a trial court to review and revise its decision, but only to enable it to recall some adjudication, made while some fact existed which, if before the court, would have precluded the rendition of the judgment, and which, without any fault or negligence of the applicant therefor, was not presented to the court.   p. 192.

2. ATTORNEY AND CLIENT.—*Client takes the risk where he refuses to follow advice given after being fully informed as to the true situation.*— Where an attorney exerts his best endeavors to inform a client charged with crime of the true situation and of what he may be required to meet, after a careful review of the facts on which success or defeat depends and the client refuses to follow the advice given, he takes the risk.   p. 193.

3. CRIMINAL LAW.—*Duty of court in receiving plea of guilty from one charged with serious crime and not represented by counsel.*—A court

should not receive a plea of guilty from a defendant charged with a serious crime, who is not represented by counsel, until after reasonable inquiry into the facts to discover whether the plea is entered freely and understandingly, and merely explaining to the defendant the penalty that might be imposed on him is not sufficient.    p. 194.

4. CRIMINAL LAW.—*Writ of coram nobis held proper.*—Accepting plea of guilty of murder in the first degree from an accused who had not been advised by counsel or the court as to the essential elements of the crime charged was an abuse of discretion, especially when he declared that he was unacquainted with the law of this state defining murder, and justified the granting of a writ of *coram nobis*, with direction to the trial court to permit the withdrawal of the plea of guilty.    p. 195.

From Knox Circuit Court; *Thomas B. Coulter,* Judge.

Dryfus Rhodes was allowed to plead guilty to the charge of murder in the first degree, and the death penalty was imposed by the court, without being advised as to the elements of the crime. He applied to the court for a writ of *coram nobis,* which was denied, and he appeals. *Reversed.*

*Shuler McCormick, Arnold J. Padgett* and *George B. Hazelton,* for appellant.

*Arthur L. Gilliom,* Attorney-General and *Edward J. Lennon, Jr.,* Deputy Attorney-General, for the State.

MYERS, J.—On April 6, 1926, appellant, in the court below, was indicted for murder in the first degree. Immediately upon the return of the indictment, and before the grand jury had time to disperse, the sheriff of Knox county brought appellant into open court and the charge was read to him by the prosecuting attorney. The court then requested him to plead, whereupon he answered that he was guilty. The next day, April 7, the court, upon the prisoner's plea, adjudged him guilty of murder in the first degree and that he suffer death. On May 3, 1926, he applied to the Knox Circuit Court for a writ of *coram nobis* (*Sanders* v. *State* [1882], 85 Ind. 318, 44 Am Rep. 29) which was denied. From

that ruling, he appealed and has assigned the same as error in this court.

We have read and considered carefully the verified application for the writ, affidavits in support thereof, and counter-affidavits, being the entire evidence upon which the ruling below denying the writ was made. That same record is before this court for review, supported by the presumption of correct action below.

Appellant's petition seems to be a frank disclosure of facts concerning his entire life, including a recital of the facts relative to the homicide with which he was charged and pleaded guilty. It covers seventeen typewritten pages of the record, and exhibits facts asserted to exist at the time he was sentenced relative to the then public activities, the evident zealous efforts of the officers, and, we may add, appellant's attitude, shown by counter-affidavits and reported to the court concerning his punishment after plea, might reasonably have had the effect of prejudicing the mind of the court unconsciously against him then, and, even later, when called upon, as here, to exercise a sound legal discretion.

Conceding that the record of his life, whether upright or as a desperado, might have some controlling influence in fixing the punishment, yet the sole question here is: Did he enter his plea of guilty fully advised of the effects of such a plea and of his rights, under the facts, afforded him by the laws of the State of Indiana? Generally speaking, there is no conflict as to the material facts.

Rhodes was a citizen of the State of Oklahoma. He came to Indiana for the first time March 20, 1926, with one Albert King, and to the home of a sister of King's at Bicknell. They remained there until April 1, 1926, when he, King, and the latter's brother-in-law, went to Vincennes in appellant's car, which they parked on North Sixth street a short distance from Main street.

They walked about the business district until they came to the candy store of Peter Bourleakas, where Rhodes purchased a package of cigarettes, paying for the same with a new five-dollar bill received by him in a hold-up of an Arkansas bank, and was given the proper change. He then left the store and joined King a block away, and thence in the direction of the automobile, intending to leave the city. Rhodes states that two men dressed in citizen's clothing came up behind them and one exclaimed: "That is the man, that is the man." He recognized Bourleakas, turned and demanded of him "What the hell do you want." At the same time, he attempted to draw his gun, which he accidentally discharged, mortally wounding Simon A. Carrie who was a few feet behind Bourleakas. Bourleakas and a nearby policeman say that when Bourleakas pointed out these men to the officers, they crossed the street in the direction of Rhodes and King, Bourleakas about ten feet ahead of Carrie and Hindman in the rear of Carrie. Bourleakas says he walked up to the men (Rhodes and King) and said to the officers: "These are the fellows that gave me the five-dollar bill." Rhodes and King then turned around, each drawing a gun. Bourleakas jumped in one direction and Hindman in another, and Carrie, who had not said anything, stood still on the sidewalk. Rhodes and King fired shots and Carrie fell. Three other persons who witnessed the shooting say that the fatal shot was fired by King, and that Rhodes shot from the hip. Rhodes says he had no intention of taking human life, or even to discharge his gun, his thought being to "stick up" two civilians who, he believed, would cower until he could reach his automobile and escape. He says other shots were fired, both by King and the officer, but none other by him. Other witnesses say that both Rhodes and King backed across the street firing shots, and when they reached the automobile,

Rhodes took the wheel and King continued to shoot until he was seriously wounded. Rhodes, being unable to start the machine, seized King's revolver, commandeered another automobile and was driven into the country and abandoned. He walked to Bicknell, arriving there late the next day. The following day, April 3, when discovered by a posse of forty or fifty officers and men, he attempted to flee and was shot at fifty or sixty times, and, although armed, he did not return the fire, but threw his guns away and threw up his hands. In this position, he was surrounded, and persons who were not of the searching party say he was thrown down and dragged a piece, and but for the interference of other members of the posse, he would have been injured. He was searched and then taken to the city hall in Vincennes, where he was questioned, and then lodged in jail, where he remained until, by the sheriff—April 6—he was taken into open court for arraignment and plea to an indictment for murder in the first degree. The indictment was read to him by the prosecuting attorney, whereupon the court said: "You have heard the reading of the indictment, how do you plead—guilty or not guilty?" Rhodes: "I am guilty, sir." The court: "Do you know the effect of a plea of guilty in this case, and what the penalty is for the crime charged?" Rhodes: "No, not in this state." The court: "It means there will be no trial or no hearing of evidence, but upon your plea you will be sentenced without further proceedings, and there will remain only the determination of the extent of the penalty. The indictment in this case charges you with first degree murder and the penalty for that under the law is that you be confined to the state prison during life or you may suffer death. Do you understand the effect of your plea and with that understanding, what do you say? Is it still your desire to plead guilty?" Rhodes:

"Yes, sir, I understand. I have no reason why I shouldn't plead guilty." The court: "I simply want you to appreciate fully what you are doing. There can be no plea of guilty today and something else later. How old are you?" Rhodes: "Twenty-five." The court: "Have you consulted with any attorney about your matter or have you had an opportunity to advise with an attorney?" Rhodes: "I have not." The court: "Have you the means of employing an attorney?" Rhodes: "I have no means to employ one." The court: "Do you desire to have an attorney?" Rhodes: "I don't know whether it would do any good." The court: "If you have no means of employing an attorney, the law gives you that right. If you are not able to employ counsel, it is the duty of the court to appoint counsel for you. Is it your desire that counsel be appointed to advise with you?" Rhodes: "Well, you can send one over if you want to."

Rhodes was then taken back to jail and the court appointed the county attorney to represent him. The attorney so appointed appeared at the jail and spent ten minutes with Rhodes, as shown by the attorney's statement to the court the next morning under oath when answering as to his opinion on the soundness of Rhodes' mind. Before pronouncing sentence, the prosecuting attorney made a statement of the evidence before the grand jury, at the conclusion of which, the court inquired of Rhodes if the statement was correct, or substantially so, to which Rhodes answered: "No sir, it isn't correct." The court: "You did, however, as soon as you were accosted by the police officer, shoot him?" Rhodes: "I let my gun go off accidentally and shot this Mr. Carrie—whatever his name is." The court: "That is the very difficulty we get into now when we begin to hear statements or evidence upon the facts charged in the indictment. He has pleaded guilty to it. Now he

would say that some other condition is true or some other things are true, and, I take it, that unless he has something to say, some reason to urge why sentence should not be passed, or something further to say, that sentence had as well be announced." Rhodes: "Yes sir, I am ready for it, but I wish—I don't mind anything being the truth told against me, but anything that isn't the truth. I will object to it. Of course, I can't do nothing, but I am just making a statement of my own, that I never fired but one shot," etc.

The attorney appointed to defend Rhodes was present and heard the foregoing colloquy. The court then asked him whether he knew of anything that had been left undone, or could be done, or of any action to protect the prisoner's rights, and the answer was: "I do not, your honor." On the morning of the evening that he pleaded to the indictment, an attorney of high standing at the Knox County Bar appeared at the jail and asked permission of the jailor to consult with appellant and was denied admission, the jailor saying: "They had it all fixed for him (appellant) to plead guilty and get him away as soon as possible." The only persons competent to advise appellant as to his legal rights admitted to the jail prior to his pleading guilty were the prosecuting attorney, who spent one hour with him, and the partner of the county attorney, time not stated, both members of the posse that captured him, and the latter the active adviser of the officers and the prosecuting attorney in the handling of the case, and who had been heard to say, when speaking of appellant: "The d— son of a b— ought to be hung."

The mother of Rhodes, residing at Henryetta, Oklahoma, was informed that a man by the name of Dryfus Rhodes was under arrest in the city of Vincennes for the murder of a policeman. Immediately she sent a telegram dated, Henryetta, Oklahoma, 2:20 p. m. April 4,

1926, to the jailor, Knox county, Vincennes, Indiana: "Have you Dryful Rhodes, when is preliminary trial. Answer. Mrs. Rhodes, Mother." Not receiving an answer the next day, she sent another telegram addressed as before: "Please reply my telegram, April 4, Mrs. Rhodes." The telegrams were received by the jailor, turned over to the sheriff who, upon advice from the prosecuting attorney, failed to answer them until after appellant had been sentenced. He excused himself for this delay on the ground that he was afraid of a jail delivery and that appellant told him not to let his mother know anything until it was all over, yet he did not tell him that he had telegrams from his mother.

The attorney appointed to represent appellant, opposing the latter's application, by affidavit, in substance, stated that at the direction of the judge of the Knox Circuit Court, he went to the jail and told Rhodes he was the county attorney, and that it was his duty to defend all poor persons charged with crime when directed to do so by the court, and that he, Rhodes, should feel perfectly free to talk with him about the case; that in a conference lasting perhaps twenty minutes, he explained to Rhodes the consequences of a plea of guilty; also that under the laws of Indiana, every person charged with crime is presumed to be innocent until his guilt is proved beyond a reasonable doubt; that a defendant is not required to become a witness in his own behalf, and that it was his personal opinion that the judge would permit him to withdraw his plea and enter a plea of not guilty if he so desired, to which Rhodes replied that he didn't know how that would help him since they had "the goods" on him. He was then told that, by withdrawing his plea, he could have a jury trial to determine his guilt and fix his punishment; that twelve jurors would have to concur in the penalty if they found him guilty, and if he left his plea stand, the judge would fix

the penalty, which might be either life imprisonment or death, to which Rhodes answered, he could not expect a lesser penalty from a jury than from a judge, and that he might say to the judge to "do as he damn pleases— he can turn me loose or give me the electric chair, I have got the guts to stand up and say, 'Thank you.'" The attorney then said: "I have tried to explain your legal rights. Is there anything that you desire to have me do for you?" to which Rhodes replied: "No, much obliged for coming over." The attorney then reported to Judge Coulter, in chambers, his conference with Rhodes, and that he desired to let his plea stand. This attorney states that he had no conference with any one other than Rhodes about the plea, or that no person influenced or sought to influence him in any way whatever; that during their conversation, nothing was said about mob violence, or about not being able to get a fair trial in Knox county.

Other affidavits were filed to the effect that there was no danger of a mob, or that Rhodes indicated any fear from mob violence, although the sheriff in his affidavit stated that, prior to his arraignment, appellant said he "had as well plead guilty for they would mob him anyway, he thought, if he didn't." Also that, upon the advice of a federal officer, he transferred appellant to the jail at Terre Haute on the theory of avoiding, if possible, jail delivery by friends of Rhodes. Appellant says that he did fear mob violence, and on the day he was sentenced, the sheriff secretly transferred him to the jail at Terre Haute for the purpose of avoiding any impending trouble or violence that might later arise. To him, the unmistakable attitude of the officers and populace that he saw indicated that he would be compelled to suffer for the highest degree of homicide. He was not told, nor did he know, that intent to kill and premeditation were necessary elements of murder in the

first degree.    He construed the talk of those around him as advice to plead guilty, and he accordingly did so.

The record before us, in its entirety, discloses facts persuasive of a conclusion which might, in the future, be regarded a regrettable precedent.    Casting aside the incidents tangently connected with this case of a pre-judicial character, and considering those only directly bearing upon the merits of the real question to be de-cided, we have the appellant in jail believing that he has committed murder by shooting another, unacquainted with the laws of this state regarding the essential ele-ments of murder in the first degree, and without any counsel or advice from any one as to his status under the facts, pleading guilty at the request of the court.    The question for decision is:    Did appellant enter a plea of guilty freely and understandingly?

This court, in *Sanders* v. *State, supra,* apparently ap-proved the statement from Freeman, Judgments, that:

1.    "The writ of error *coram nobis* is not intended to authorize any court to review and revise its opin-ions; but only to enable it to recall some adjudi-cation, made while some fact existed which, if before the court, would have prevented the rendition of the judg-ment, and which, without any fault or negligence of the party, was not presented to the court."

Thus, it will be observed that the court below in the instant case had before it a question of fact only, and the question on appeal is not different.    Hence, the ruling of the trial court must stand unless this court can say, from the unconflicting evidence as the controlling factor, and in connection with all of the evidence given, that the trial court abused its discretion.    *Dobosky* v. *State* (1915), 183 Ind. 488, 109 N. E. 742.

No one can read the record in the instant case without reaching the conclusion that appellant was completely under the influence of those charged with the enforce-

ment of the criminal law, and who purposed
to have him ."plead guilty and get him away
as soon as possible." The facts and circumstances
brought to our attention unquestionably show concerted
action on the part of the officers to keep appellant away
from those who might offer suggestions in his interest,
or give him legal advice as to matters vitally important
to him and possibly be instrumental in changing his
mind as to the plea he would otherwise make to the in-
dictment. True, the county attorney, admittedly of
high standing at the bar and learned in the law, had a
twenty-minute interview with him, but a fair analysis
of this attorney's activities fails to disclose more than
passive interest in his pauper client. He must be cred-
ited with having some knowledge of human nature and
the general characteristics of a client who, in this in-
stance, immediately gave evidence of braggadocian
courage. The experienced lawyer many times has ob-
served seeming thoughtlessness of his client respecting
the outcome of pending litigation. In such case, he
does not abandon his client, but, on the contrary, exerts
his best endeavors to inform him of the true situation
and of what he may be required to meet after a careful
review of the facts upon which the success or defeat of
the litigation depends. In a civil or criminal case, a
client thus advised has had proper counsel, and when he
refuses to follow such advice, he takes the risk.

Conceding that the attorney for the prisoner in this
case, whether the interview lasted ten minutes as first
stated by the attorney, or twenty minutes as stated
in his affidavit, correctly advised him as to the effect
of his plea, still he made no effort whatever to ob-
tain the prisoner's story concerning the facts of the
homicide, either at the time of the interview or later on
hearing his client's response and denial of the statements

made by the prosecuting attorney. The court was evidently impressed with the prisoner's denial of deliberately shooting Carrie, and his claim of accidental discharge of his gun, for the court immediately turned to the prisoner's attorney and, by questions, sought pertinent advice before pronouncing sentence.

It affirmatively appears without contradiction that appellant did not know, nor was he advised of, the essential elements or facts in this state required to

3.  be proved beyond a reasonable doubt in order to constitute murder in the first degree; nor was he requested by any one to narrate the facts connected with the homicide for the purpose of apprising him of the law as applied to them.

The facts relied on by appellant to show that his plea of guilty was not entered freely and understandingly are: that he was required to plead to the indictment without the advice of counsel, whom he was financially unable to employ; ignorance of the facts constituting murder in the first degree; inference as to what his plea should be drawn from conversations with the officers in whose charge he was and others permitted to see him; refusal by the officers to admit a reputable attorney to advise with him prior to his arraignment and plea; plea of guilty induced through fear of mob violence; and failure of his lawyer appointed by the court to properly represent him. All of these grounds, except the last one, have reference to commissions or omissions prior to his plea of guilty. This court has expressed disapproval of trial courts receiving pleas of guilty from defendants charged with serious crime, who are not represented by counsel, until "after reasonable inquiry into the facts to discover whether a plea of guilty is entered freely and understandingly." *Debosky* v. *State, supra,* p. 491; *Mislik* v. *State* (1915), 184 Ind. 72, 110 N. E. 551; *Bielich* v. *State* (1920), 189 Ind. 127, 126 N. E. 220.

The court in the instant case received the plea and afterwards made the inquiry, at that time saying to appellant: "There can be no plea of guilty today and something else later on." Having suggested the procedure to be followed by *nisi prius* courts in the class of cases to which the instant case belongs, we must insist that it be followed. However, were we disposed to disregard the method pursued by the court in this particular, which we are not persuaded to do, still we face other admitted rights and information denied the accused important to him when called upon, as here, to plead. The only significant fact urged by appellant and challenged by the state is that his plea of guilty was induced through fear of mob violence. If we regard that fact as disputed, and the finding in that particular favorable to the state, still the evidence is quite conclusive that the trial court abused its discretion by assuming, as it must have done, that to acquaint the prisoner with the penalty that may be inflicted upon him is all that the law requires in this class of cases to warrant the sustaining of a plea of guilty. Obviously, from the evidence in this case, the plea of guilty was induced under circumstances which, if applied to the ordinary affairs of life, would sustain a finding of fraud. In view of appellant's claim of firing but one shot, and that one accidentally, which he believed took effect, although three witnesses state under oath that it was King who fired the fatal shot, and considering this record as a whole, we are convinced that no harm will result to society or to the state from an order that would permit him to make his defense to the charge of murder, and to have a fair trial.

Judgment reversed, with instructions to vacate the judgment of conviction and to permit appellant to withdraw his plea of guilty and enter one of not guilty. The clerk of this court is directed to make and certify

the usual order for the return of appellant to the custody of the sheriff of Knox county.

Willoughby, J., not participating.