JERRY BRIMHALL v. STATE OF INDIANA.

[No. 770S165. Filed March 9, 1972.]

*John D. Shuman,* of Elkhart, for appellant.

*Theodore L. Sendak,* Attorney General, *Walter E. Bravard, Jr.,* Deputy Attorney General.

DeBruler, J.—On March 7, 1970, a Saturday night, a fight broke out in the Sportman's Bar in Goshen, Indiana, and sometime later a shot was fired in the Bar. In connection with that incident, the appellant was asked to report to the police department for questioning and after the appellant went to the police department in response to this request, he was arrested on a charge of public intoxication. Sometime on the following Monday, March 9, 1970, the appellant was charged by affidavit

with assault with intent to kill. The relevant portion of the charging affidavit read as follows:

> "that on or about the 8th day of March, 1970, at the Sportsman's Bar, in the City of Goshen, Elkhart County, in the State of Indiana, one Jerry L. Brimhall, having the ability to do so did then and there attempt to commit a violent injury upon Donald Cook and did then and there intend to kill said Donald Cook by attacking and swinging at said Donald Cook with a broken beer bottle."

The court found that probable cause existed for the issuance of a warrant for the arrest of the appellant, and set the bail at $25,000.00. On the next day, Tuesday, March 10, 1970, the State moved in open court to amend the charging affidavit to assault with intent to commit a felony, to-wit: mayhem, rather than assault with intent to kill. The appellant appeared before the Honorable Aldo J. Simpson, Judge of the Elkhart Circuit Court of Elkhart County, and entered a plea of guilty to assault with intent to commit a felony, to-wit: mayhem. The following is a record of that guilty plea proceeding:

> "MR. PETERSON: Mr. Brimhall will you please come up? Let the record show that the defendant is in court in person and by Richard W. Mehl, his attorney. Waives arraignment and pleads guilty to assault with intent to commit a felony, to-wit: Mayhem.
>
> THE COURT: All right.
>
> MR. PETERSON: And we ask for a presentence investigation.
>
> MR. MEHL: You understand this and this is what you want to do?
>
> MR. BRIMHALL: We don't have to have a presentence investigation, do we?
>
> MR. MEHL: If you want to, you can waive it.
>
> THE COURT: What is the penalty?
>
> MR. PETERSON: Imprisonment for not less than ten years, your Honor.
>
> THE COURT: All right. How old are you?
>
> MR. BRIMHALL: Twenty-nine.
>
> THE COURT: You are twenty-nine. When were you twenty-nine?

MR. BRIMHALL: The second of January, 1941.

MR. MEHL: No, 1970.

THE COURT: You were born in 1941?

MR. BRIMHALL: Yes.

THE COURT: O.K.

(thereupon, Judge Simpson dictated the following docket entry):

'Prosecuting attorney amends the affidavit to show rather than assault with intent to kill to assault with intent to commit a felony, to-wit: Mayhem. Defendant in court in person and by Richard W. Mehl, his attorney. Waives arraignment and pleads guilty to assault with intent to commit a felony, to-wit: Mayhem. Defendant waives pre-sentence investigation and asked that he be immediately sentenced and committed. Finding that the defendant is guilty of assault and battery with intent to commit a felony, to-wit: Mayhem, as charged. That he is 29 years of age. That he be committed to Indiana Reformatory for an indeterminate period of not less than one nor more than ten years. That he be disfranchised for one year. Commitment ordered. Judgment.' "

Approximately one month later the appellant filed a verified petition for vacation of judgment and for leave to withdraw his plea of guilty and to enter a plea of not guilty, on the grounds that his plea of guilty was not made freely and under-standingly. Pursuant to this petition, an evidentiary hearing was held and the court subsequently overruled the defendant's petition. This appeal is from that decision.

At the evidentiary hearing on the petition to withdraw the guilty plea, the following facts were adduced. The appellant testified that he was intoxicated on the Saturday in question and that a fight erupted in the tavern while a friend of his was being ejected. He admitted breaking a beer bottle and brandishing it to keep others from jumping on his friend, but denied swinging it at anyone or cutting anyone. He stated that he was arrested later that evening in the company of two other men who had not been involved in the incident on a charge of public intoxication and that he remained in jail until the following Monday morning. At that time he went to a

hearing for public intoxication, and he testified that he posted a $50.00 bond on that charge and was told that he would be released. However, when he returned to the jail to pick up his things he was detained, and several hours later charged with assault and battery with intent to kill. He testified that no one questioned him at any time concerning the events of that previous Saturday night. He stated that he went to a hearing the next morning and spoke to an attorney briefly about his case. He said that the attorney advised him that his bail was set at $25,000.00, and that it would be impossible to get it lowered. He also was told that he would have to wait in jail from three to six months before he went to trial unless he wanted to plead guilty, and that he would have to get another lawyer if he wanted to go to trial.

There is no evidence that the appellant ever discussed his version of the incident with an attorney, and he testified that the first time that he heard anyone had been cut was after he had been imprisoned after several weeks. As to his state of knowledge at the time of entering the plea of guilty, he testified as follows:

"Q. You didn't know what mayhem was at that time?
A. I never heard the word before in my life.
Q. And did you know at that time that Donald Cook didn't want to press charges against you?
A. I didn't know nothing until after I was down at Pendleton for two weeks. I got a letter that said I cut or stabbed Donald Cook, and I knowed I didn't, so I told my people, 'try to get a lawyer and find out why I was charged with cutting somebody'. I knowed I didn't cut and if I didn't cut nobody and they sent me down for that, I might be able to get a retrial and beat this.

* * *

Q. When you plead guilty to the charge of assault and battery with intent to commit a felony, to-wit: mayhem, did you know, or had anybody told you, that Donald Cook didn't think you intended to cut him?
A. I didn't even know that Donald Cook's name was mentioned until after I told Mehl I would take one to ten, and then I asked Mehl would he let me see the warrant

that was sworn out against me, and I was sitting over there, and he got me the warrant and I read it, and I asked who Donald Cook was. Well, he said, he was one of the guys involved in that thing down at the Sportman's, that swore the warrant out."

Donald Cook, the victim, testified that one of the appellant's friends and an employee of the bar began scuffling and a crowd of people moved outside. The appellant broke a beer bottle on the door and was telling the crowd to leave his friend alone. The owner of the bar grabbed the appellant and told him to settle down and Mr. Cook also grabbed at the bottle. He testified that he did not remember the bottle touching him at that point and that the appellant lowered the bottle to his side. Then a short fight occurred between the original antagonists and the victim and the appellant stood aside and watched it. The following testimony reveals the nature of the wound received in this case:

"Q. When did you first learn you were cut?
A. Well, after it was over and I looked at my arm, and it wasn't cut, it was a scratch.
Q. Where was the scratch?
A. Just across my forearm here.
Q. On the back side of your forearm?
A. Yes.
Q. Between your elbow and your wrist?
A. Yes.
Q. Could you estimate how long the scratch was?
A. About three or four inches.
Q. Was it a deep scratch?
A. No, just like a fingernail.
Q. Like a fingernail would make?
A. Yes.
Q. Did you get any medical attention for this scratch?
A. No, I just went in and wiped it off with a damp rag and went on working."

The victim, Mr. Cook, further testified that he signed a statement for the police concerning the incidents that evening.

When questioned about that portion of the statement which indicated that the appellant had hit him with a bottle, he replied:

> "Q. In this statement, Mr. Cook, it says, in part, about half-way down the page, 'Then Brimhall called us niggers and told us to come on outside. Brimhall hit me on the lower left arm with the beer bottle and I received a'— it appears to be a 'four-inch scratch and a small stab wound.' Are these the exact words that you used in telling Sergeant Lung what happened?
>
> A. No, I told him I got a four-inch scratch, and he is the one that said, 'Oh, what is that?' And he pointed to my arm and said, 'puncture wound'. So he put 'puncture wound'.
>
> Q. What, in fact, if you recall, did you tell Captain Lung about your getting scratched?
>
> A. Well, I just told him, you know, Jerry busted the bottle and then I didn't tell him about, you know, me reaching for it and everything, and I said, well, then, I got hit with the bottle. That was the only way I could have got cut. But when I said 'hit', I didn't mean he hit me over the head or something. I reached for the bottle and got hit with the bottle, and then they used a little few choice words. . . ."

He denied that the appellant had intended to strike him at any time.

The appellant's attorney testified that he was in court on the day in question on other matters. He spoke to the appellant briefly and, in response to appellant's questions, told him that he could not get his bail reduced and that his case would not come to trial for at least three months, and would probably be scheduled sometime in September or October, some six to seven months away. He testified that he got the court file and read the charging affidavit to the appellant and let him read it for himself. He testified that he neither went over the language of the affidavit with the appellant, nor did he talk about any of the legal elements of assault and battery with intent to kill. He further testified that he did not show the appellant a copy of the statute under which he was charged,

and that, although he would have discussed the definition of mayhem with the appellant if he had been asked, he had no recollection of discussing mayhem with the appellant.

He further testified that he told the appellant that the prosecutor would accept a guilty plea to the lesser offense of assault and battery with the intent to commit a felony, to-wit: mayhem, and that he told the appellant what the lesser senence would be for this offense. At that time the appellant said he was going to enter a plea of not guilty and the attorney informed him that he would not be willing to represent him at trial. The appellant again indicated his desire to plead not guilty and the attorney left. A short while later, the appellant's co-defendant decided to plead guilty. After this plea was entered, the attorney testified as follows:

> "Again, we went forward with some other things in front of the bench, and again Mr. Brimhall wanted to talk to me, and we went back out and we talked further. I don't remember— it was, basically, whether I didn't think I could get the bond reduced. I kept telling him no. He wanted to know whether I would represent him. I said no, I would not, that the court would appoint somebody if he didn't have the financial ability to do so. He said, 'then can I enter a plea of guilty' I said, 'if you are guilty, and you want to enter a plea of guilty, this is alright.' So he came back in and was brought before the court and the same type procedure was followed."

One of the attorneys present at the conference prior to the arraignment that morning was called and testified as follows:

> "I told Mr. Mehl I would like to talk to him and he said, sit down, and he was at that time talking to Mr. May and Mr. Brimhall. He told Mr. Brimhall and Mr. May that he was not going to go to trial for them; that the financial experience he had had with them in the past had not been good; that he was a busy man. However, he said, I have talked to the prosecutor. The prosecutor is willing to go on the lesser of the two charges and you can enter this plea if you see fit to enter it. If you do not, you face the possibility of spending three to six months in the county jail until a time can be arranged for your trial, and if you

decide this is what you want to do, I will go in and at no charge and enter the plea for you. . . . As I recall, Mr. Brimhall asked me the second time, and I said, well, I have heard part of what Mr. Mehl told you, and I will give you a little free advice. You know the facts here, and Mr. Mehl has been able to make this arrangement with the prosecutor on the lesser charge, and I think that he is correct in stating it will be from three to six months before you can go to trial, and certainly, it is worthwhile thinking about it. . . ."

He also testified that he believed that Mr. Brimhall understood the situation in that his choice was between waiting several months to go to trial on a more serious charge, and immediately pleading guilty to a lesser charge. He did not recall any discussion concerning the nature of the charges or the elements of the charges in his presence.

The appellant argues that the trial court abused its discretion in overruling the appellant's verified motion for vacation of judgment and for leave to withdraw his plea of guilty, and to enter a plea of not guilty. *It is important to emphasize that the appellant does not raise a question of guilt or innocence, but merely asks he be allowed to go to trial.* A plea of guilty, to be valid, must be made freely and understandingly by the accused. *Thacker* v. *State* (1970), 254 Ind. 665, 262 N. E. 2d 189; *Harshman* v. *State* (1953), 232 Ind. 618, 115 N. E. 2d 501; *State* v. *Lindsey* (1952), 231 Ind. 126, 106 N. E. 2d 230; *Ketring* v. *State* (1935), 209 Ind. 618, 200 N. E. 212; *Rhodes* v. *State* (1926), 199 Ind. 183, 156 N. E. 389. The law in this State as it applies to pleas of guilty was well stated in *Harshman* v. *State, supra,* where it was said:

"Under our practice an accused may enter a plea of guilty in any case, and thereby waive his constitutional right to trial by jury. But to be valid and binding upon the accused, such a plea must be made by the accused intelligently, advisely and understandingly, and with full knowledge of his rights, and with the considered approval of a judge before whom he stands charged." 232 Ind. at 620.

The reasons for this careful approach to a plea of guilty were well expressed by the United States Supreme Court in a recent case, where it was said:

"That a guilty plea is a grave and solemn act to be accepted only with care and discernment has long been recognized. Central to the plea and the foundation for entering judgment against the defendant is the defendant's admission in open court that he committed the acts charged in the indictment. He thus stands as a witness against himself and he is shielded by the fifth amendment from being compelled to do so—hence the minimum requirement that his plea be voluntary expression of his own choice. But the plea is more than an admission of past conduct; it is the defendant's consent that judgment of conviction may be entered without a trial—a waiver of his right to trial before a jury or a judge. Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady* v. *U.S.* (1970), 397 U.S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747.

Because of the grave nature of a guilty plea, the trial court has a duty to closely scrutinize the situation and be sure that the offered plea is freely and understandingly given, for "the court is backward in receiving and recording the plea of guilty from a prisoner." *Griffith* v. *State* (1871), 36 Ind. 406, 408. As we said in *Mislik* v. *State* (1915), 184 Ind. 72, 110 N. E. 551, "that a plea of guilty should be entirely voluntary, and made by one competent to know the consequences thereof, and that the trial court should satisfy itself of these facts before receiving it, appears to be well settled."[1]

---

1. As guidelines in this area, we can find none better than those outlined in the following sections of the approved draft of the American Bar Association Project on Minimum Standards for Criminal Justice, Pleas of Guilty:

"1.4 Defendant to be advised by court.

The court should not accept a plea of guilty or nolo contendere from a defendant without first addressing the defendant personally and

(a) determining that he understands the nature of the charge;

(b) informing him that by his plea of guilty or nolo contendere he waives his right to trial by jury; and

(c) informing him:

In discharging this duty to consider and pass upon the validity of the guilty plea, the trial judge must put on the record facts which indicate the status of the plea, as called for in Supreme Court Rule 1-11, (now Criminal Rule 10). *Lockhart* v. *State* (1971), 257 Ind. 349, 274 N. E. 2d 523. As we said in *Campbell* v. *State* (1951), 229 Ind. 198, 96 N. E. 2d 876:

"One of the reasons for the adoption of Rule 1-11, supra by this court is to provide an unimpeachable record showing the extent of the inquiry into the facts, circumstances and conditions made by the trial court to ascertain at the time whether the offered plea of guilty is made freely and

(i) of the maximum possible sentence on the charge, including that possible from consecutive sentences;

(ii) of the mandatory minimum sentence, if any, on the charge; and

(iii) when the offense charged is one for which a different or additional punishment is authorized by reason of the fact that the defendant has previously been convicted of an offense, that this fact may be established after his plea in the present action if he has been previously convicted, thereby subjecting him to such different or additional punishment.

"1.5 Determining voluntariness of plea.

The court should not accept a plea of guilty or nolo contendere without first determining that the plea is voluntary. By inquiry of the prosecuting attorney and defense counsel, the court should determine whether the tendered plea is the result of prior plea discussions and a plea agreement, and, if it is, what agreement has been reached. If the prosecuting attorney has agreed to seek charge or sentence concessions which must be approved by the court, the court must advise the defendant personally that the recommendations of the prosecuting attorney are not binding on the court. The court should then address the defendant personally and determine whether any other promises or any force or threats were used to obtain the plea.

"1.6 Determining accuracy of plea.

Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as may satisfy it that there is a factual basis for the plea.

"1.7 Record of proceedings.

A verbatim record of the proceedings at which the defendant enters a plea of guilty or nolo contendere should be made and preserved. The record should include (i) the court's advice to the defendant (as required in section 114), (ii) the inquiry into the voluntariness of the plea (as required in section 1.5), and (iii) the inquiry into the accuracy of the plea (as required in section 1.6)."

understandingly. Without such record the trial court is, by its own volition, shorn of the procedural facts that might protect its judgment from attack." 229 Ind. at 202.

The United States Supreme Court, in discussing a similar federal rule, held that the rule had two purposes, first to assist the district judge to make a constitutionally required determination that a defendant's guilty plea is truly voluntary, and second, to produce a complete record at the time the plea is entered of the factors relevant to this voluntariness determination. *McCarthy v. U.S.* (1969), 394 U.S. 459, 89 S. Ct. 1166, 22 L. Ed. 2d 418.

The court in *McCarthy* reversed a conviction where the federal rule was not complied with holding that there is no adequate substitute for "demonstrating *in the record at the time the plea is entered* the defendant's understanding of the nature of the charge against him." (Emphasis added.) 394 U.S. at 470. In summing up their disposition of this case, the U.S. Supreme Court stated:

> "Our holding that a defendant whose plea has been accepted in violation of Rule 11 should be afforded the opportunity to plead anew not only will insure that every accused is afforded those procedural safeguards, but also will help reduce the great waste of judicial resources required to process the frivolous attacks on guilty plea convictions that are encouraged, and are more difficult to dispose of, when the original record is inadequate. It is, therefore, not too much to require that, before sentencing defendant to years of imprisonment, district judges take the few minutes necessary to inform them of their rights and determine whether they understand the action they are taking." 394 U.S. at 472.

This reasoning is persuasive and was given constitutional dimension in *Boykin* v. *Alabama* (1969), 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274, the U.S. Supreme Court held that in order to satisfy the constitutional requirements of due process, the record of the entry of the plea must demonstrate a knowing and intelligent waiver by the accused

of his constitutional rights. Since the *Boykin* case, presuming waiver from a silent record in a guilty plea case is impermissible.

In this case, the record is silent as to the discharging of the trial court's burden to determine that the guilty plea was properly entered. It is axiomatic that "every reasonable presumption should and is indulged against a waiver of fundamental rights." *U. S.* v. *Lane,* 193 F. Supp. 395, 399 (D.C. Ind. 1961), rev. on other grounds, 302 F. 2d 38 (1962). See also, *Grubbs* v. *State* (1970), 255 Ind. 411, 265 N. E. 2d 40; *Johnson* v. *Zerbst* (1938), 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461; *Glasser* v. *U.S.* (1941), 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680. There is nothing in this record to indicate that the appellant was advised of his rights under the State and Federal Constitutions, and nothing to indicate that he intentionally and freely waived those rights.

In addition, no evidence exists to support the conclusion that this plea was "intelligently" and "understandingly" entered for there is no evidence that the appellant understood the facts to which he was admitting nor that he understood the law in relation to those facts. There is no evidence in this case that any attempt was ever made to ascertain the appellant's version of the events in question, and to analyze that version in relation to the formal charge. Indeed, the evidence indicates that the legal elements of the crime were not discussed. In Indiana, there exist nine separate offenses with varying sentences which can be charged under the general rubric of assault and battery, with maximum sentences varying from six months to fourteen years. See Foust, "Some Thoughts on Criminal Code Revision," 1 Ind. Legal Forum 4, 23 (1967). The initial charge in this case, assault with intent to kill, was changed to assault and battery with intent to commit a felony, to-wit: mayhem, prior to the entry of the plea. Indiana statutes recognize two kinds of mayhem, simple and malicious. Simple mayhem, as defined in I. C. 1971, 35-1-54-6, being Burns § 10-408, is as follows:

"whoever, violently and unlawfully, deprives another of the use of any bodily member, or unlawfully and wilfully disables the tongue or eye, or cuts, bites or slits the nose, ear or lip of another is guilty of simple mayhem . . . and shall be imprisoned in the county jail not less than twenty days nor more than six months."

Malicious mayhem, on the other hand, is defined in I. C. 1971, 35-1-54-5, being Burns § 10-407, as:

"Whoever, purposely and maliciously, with intent to maim or disfigure, cuts, bites or slits the nose, ear or lip, cuts out or disables the tongue, puts out or destroys an eye, cuts off or disables a limb or any member of another person, is guilty of malicious mayhem, and on conviction, shall be imprisoned in the state prison not less than two years, nor more than fourteen years, and be fined not more than two thousand dollars."

The charging affidavit did not distinguish the type of mayhem being charged and the appellant can surely not be presumed to understand the subtle differences involved. Suffice it to say that in a case such as this, a close examination of the facts and their relevance to the specific charge are of the utmost importance. As we said in *Goff* v. *State* (1960), 240 Ind. 267, 163 N. E. 2d 888:

"Arraignment is a crucial step in the course of criminal procedure. It is at this juncture in the proceeding that the accused hears the formal charge which is lodged against him and is called upon to enter his plea. He must decide whether he has in fact committed the offense with which he is charged, in the manner that he is charged with having committed said offense and with the necessary intent. If so, he is guilty, if not he is not guilty and should so plead. The initial determination of whether or not one is legally 'guilty' of a particular crime beyond a reasonable doubt should be made by competent counsel who shall examine the formal charge and weigh the facts relevant thereto in order to properly advise the defendant as to the nature of his plea. Only with benefit of skilled representation can a defendant appear for arraignment and intelligently enter his plea." 240 Ind. at 273.

In the present case, we have no indication that his examination and analysis of the facts in relation to the charge was ever made. We are reminded of this situation in *Rhodes* v. *State, supra,* in which a guilty plea was entered after a short conference with an attorney. In that case it was stated:

"True, the county attorney, admittedly of high standing at the Bar and learned in the law, had a twenty minute interview with him, but a fair analysis of this attorney's activities fails to disclose more than a passive interest in his pauper client . . . the experienced lawyer many times has observed seeming thoughtlessness of his client respecting the outcome of pending litigation. In such case, he does not abandon his client, but, on the contrary, exerts his best endeavors to inform him of the true situation and of what he may be required to meet after a careful review of the facts upon which the success or defeat of the litigation depends. In a civil or criminal case, a client thus advised has had proper counsel, and when he refuses to follow such advice, he takes the risk.

"Conceding that the attorney for the prisoner in this case . . . correctly advised him as to the effect of his plea, still he made no effort whatever to obtain the prisoner's story concerning the facts of the homicide. . . .

\* \* \*

"It affirmatively appears without contradiction that appellant did not know, nor was he advised of, the essential elements or facts in this state required to be proved beyond a reasonable doubt in order to constitute murder in the first degree; nor was he requested by anyone to narrate the facts connected with the homicide for the purpose of apprising him of the law as applied to them." 199 Ind. at 193-194.

Under the formal charge in this case, assuming that the felony involved was meant to be malicious mayhem,[2] the State was faced with the burden of proving beyond a reasonable doubt that the appellant purposely and maliciously attempted to cut off or permanently disable a limb of the victim. Burns § 10-407, *supra; Pierce* v. *State* (1942), 220 Ind. 225, 41 N. E. 2d 797.

---

2. Simple mayhem is a misdemeanor and could not be charged as an attempted felony in this case.

We hold that this plea was not understandingly and intelligently entered. The judgment of the trial court denying this petition is reversed and this cause is now remanded to the trial court and the trial court is ordered to grant said petition.

Arterburn, C.J., Givan, Hunter and Prentice, JJ., concur.

NOTE.—Reported in 279 N. E. 2d 557.