TURNER LEE BOLES *v.* STATE OF INDIANA.

[No. 1072S130.  Filed November 26, 1973.]

*Ferdinand Samper, Ferd Samper, Jr.,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *John Carmody,* Deputy Attorney General, for appellee.

HUNTER, J.—This is an appeal from the denial of post-conviction relief wherein the appellant sought to withdraw a plea of guilty to second degree murder. The appellant was originally indicted for first degree murder in 1967. He entered a plea of not guilty at his arraignment on November 22, 1967. On December 11, 1967, the appellant and two co-defendants appeared in Marion Criminal Court with counsel and indicated to the trial court that they wished to withdraw their previously entered pleas and plead guilty to lesser charges. The appellant wished to withdraw his plea of not guilty to first degree murder and enter a plea of guilty to second degree murder.

At the post-conviction relief hearing, the State introduced the transcript of the appellant's guilty plea. The transcript shows unequivocally that the appellant was advised of the constitutional rights deemed waived by the guilty plea. The trial court carefully instructed the appellant as to the consequences of a guilty plea. This is the transcript:

*"COURT MET PURSUANT TO ADJOURNMENT AND THE TRIAL OF THIS CAUSE WAS COMMENCED*
*"MR. BATH:* Leon Pettyjohn, Howard Soots and Turner Boles, CR 67-0983.
*"THE COURT:* The record shows that there is a motion pending by the State to amend by interlineation so as to correct the date 1967 and insert the date 1966. That motion is sustained. The indictment is ordered so amended. The record shows that the defendants have each been arraigned in open Court by having the indictment read to them. Each has pleaded not guilty. Mr. Blum?
*"MR. BLUM:* At this time, Your Honor, Turner Lee Boles wishes to withdraw his former plea of not guilty and plead guilty to second degree murder as included in the first count of the indictment.

*"THE COURT:* Does the State consent?

*"MR. BATH:* The State will consent to second degree murder.

\* \* \*

*"THE COURT:* All right, now let's see. Mr. Boles, are you Mr. Boles?

*"DEFENDANT BOLES:* Yes, sir.

*"QUESTIONS BY THE COURT:*

"Q. Do all three of you understand that you don't have to plead guilty?

*"DEFENDANTS SOOTS AND PETTY JOHN* [sic]: (A) Yes, sir.

"Q. Mr. Boles?

*"DEFENDANT BOLES:* (A) Yes, sir.

"Q. You understand on the contrary you have a right to plead not guilty and have a trial by jury, do you all understand that?

*"DEFENDANTS BOLES AND SOOTS:* (A) Yes, sir.

"Q. Mr. Pettyjohn?

*"DEFENDANT PETTYJOHN:* (A) Yes, sir.

"Q. Mr. Boles, how old are you?

*"DEFENDANT BOLES:* (A) Thirty-six years old.

"Q. And how far did you go in school?

"A. (Boles) I never went to school.

"Q. Can you read and write?

"A. (Boles) Very little.

"Q. Mr. Soots, how old are you?

"A. (Soots) Thirty-four.

"Q. How far did you go in school?

"A. (Soots) One year at high school.

"Q. And you can read and write all right, can you?

"A. (Soots) Yes.

"Q. All right. Mr. Pettyjohn, how old are you?

"A. (Pettyjohn) Thirty-one, sir.

"Q. How far did you go in school?

"A. (Pettyjohn) Eighth grade.

"Q. You can read and write all right, can't you?

"A. (Pettyjohn) Yes, sir.

"Q. Do all of you understand that when I say trial by jury that would mean a trial by twelve impartial people who would sit over there in that jury box, listen to all of the evidence in the case and then decide the result. Do you all three understand that?

"A. (Boles) Yes, sir.

"A. (Soots) Yes, sir.

"A. (Pettyjohn) Yes, sir.

"Q. And do all three of you understand that if you were to have such a trial by jury, the result of that trial might be more severe than the result of a guilty plea, or it might be less severe than the result of a guilty plea, or it might be a verdict of not guilty, which would mean you would go absolutely free. Do all three of you understand that?

"A. (Soots)   Yes, sir.

"Q. Mr. Boles?

"A. (Boles)   Yes.

"Q. Mr. Pettyjohn?

"A. (Pettyjohn)   Yes, sir.

"Q. Do all three of you understand that if you were to have such a trial by jury, during that trial you would not have to do anything if you didn't want to, do you all three underthat [sic] that? In other words if you wanted to, you could just sit at the table because you wouldn't have to disprove anything, do all three of you understand that?

"A. (Boles and Soots)   Yes.

"Q. Mr. Pettyjohn?

"A. Yes, sir.

"Q. On the contrary it would be up to the State to go ahead with the evidence and to prove beyond a reasonable doubt that all three of you did exactly what the State says you did here in this indictment which is the formal charge against you. Now do all three of you understand that?

"A. (Soots and Pettyjohn)   Yes, sir.

"Q. Mr. Boles?

"A. Yes, sir.

'Q. Do you understand that if on the other hand you did want to, you would have a right to take the stand and testify for yourself, to tell your side of the case, to introduce other evidence, to call witnesses to come to Court to testify for you and to have all witnesses for the State cross examined by your lawyer. Now do all three understand that? Mr. Boles?

"A. (Boles)   Yes, sir.

"Q. Mr. Soots?

"A. (Soots)   Yes, sir.

"Q. Mr. Pettyjohn?

"A. (Pettyjohn)   Yes, sir.

"Q. Do you also understand that if you were to have such a trial and not like the result of it that you would have a right to appeal to the Indiana Supreme Court

in an effort to change that result. Do you all understand that?

"A.   (Boles, Soots and Pettyjohn)   Yes, sir.

"Q.   And do all three of you understand that you would be entitled as a matter of right to have a lawyer at all stages through both the trial and the appeal, do you understand that?

"A.   (Boles, Soots and Pettyjohn)   Yes, sir.

"Q.   And do you all understand that if you didn't have the money for a lawyer, either for the trial or for the appeal or both, I would see that you got one anyway. Do you all three understand that?

"A.   (Boles, Soots and Pettyjohn)   Yes, sir.

"Q.   Do all three of you understand that all of these things I have mentioned to you here this morning, these are all your rights as you stand here now.

"A.   (Boles and Soots)   Yes, sir.

"Q.   Mr. Pettyjohn?

"A.   (Pettyjohn)   Yes, sir.

"Q.   And all three of you understanding that these are your rights right now, do you want to plead guilty as you have indicated?

"A.   (Soots and Pettyjohn)   Yes, sir.

"Q.   Mr. Boles?

"A.   (Boles)   Yes, sir.

"Q.   Now are any of you pleading guilty because of any threats or promises that have been made to you? Mr. Boles?

"A.   (Boles)   No, sir.

"Q.   Mr. Soots?

"A.   (Soots)   No, sir.

"Q.   Mr. Pettyjohn?

"A.   (Pettyjohn)   No, sir.

"Q.   Do all three of you understand the crimes to which you are pleading guilty? Mr. Boles do you understand the crime to which you are pleading guilty, what the charge is to which you are pleading guilty?

"A.   (Boles)   Second degree murder.

"Q.   Second degree murder, do you understand that?

"A.   (Boles)   Yes, sir.

"Q.   Now, Mr. Soots, do you understand what you are pleading guilty to.

"A.   (Soots)   Yes, sir.

"Q.   And what is that?

"A.   (Soots)   Manslaughter.

"Q.   All right, Mr. Pettyjohn, do you understand what you are pleading guilty to?

"A.  (Pettyjohn)  Yes, sir.

"Q.  And what is that?

"A.  (Pettyjohn)  Manslaughter.

"Q.  Now, Mr. Boles, do you understand what the maximum penalty for second degree murder, to which you are pleading guilty here this morning, can be?

"A.  (Boles)  A life sentence.

"Q.  Mr. Soots, do you understand what the maximum penalty can be for the charge to which you are pleading guilty?

"A.  (Soots)  Two to twenty-one. ·

"Q.  Imprisonment for not less than two years nor more than twenty-one years, you understand that?

"A.  (Soots)  Yes, sir.

"Q.  Mr. Pettyjohn, do you understand what the. maximum penalty can be for the charge to which you are pleading guilty?

"A.  (Pettyjohn)  Yes, sir.

"Q.  And what is that?

"A.  (Pettyjohn)  Two to Twenty-one years.

"Q.  All right. All three of you have consulted with your respective attorneys, have you before entering this plea?

"A.  (Boles and Soots)  Yes, sir.

"Q.  Mr. Pettyjohn?

"A.  (Pettyjohn)  Yes, sir.

"Q.  And after consultation with your respective attorneys, I take it that all three of you feel it is in your best interest to enter these pleas. Is that about it?

"A.  (Boles, Soots and Pettyjohn) Yes, sir.

"Q.  Now this indictment which is the formal charge against you here says in substance, that on December the seventeenth, 1966, each of you purposely and with premeditated malice killed Samuel Monroe, who was a human being, by shooting Samuel Monroe with a gun and that as a result of the mortal wounds inflicted upon him by you, Samuel Monroe then and thereby died. Now, Mr. Boles, do you understand that you are pleading guilty to second degree murder as covered by that charge? In other words these are the facts under which you are pleading guilty to second degree murder. Do you understand this all right?

"A.  (Boles) Yes, sir.

"Q.  In other words this is the fact situation out of which this guilty pleae [sic] arose, you understand that, don't you?

"A. (Boles) Yes, sir.

"Q. Now, Mr. Soots and Mr. Pettyjohn, do you both understand that you are pleading guilty to manslaughter as covered by that charge? Mr. Soots?

"A. (Soots) Yes, sir.

"Q. Mr. Pettyjohn?

"A. (Pettyjohn) Yes, sir.

"Q. Understanding all the things I have indicated to you here today, Mr. Boles do you want to plead guilty as you have indicated?

"A. (Boles) Yes, sir.

"Q. Mr. Soots?

"A. (Soots) Yes, sir.

"Q. Mr. Pettyjohn?

"A. (Pettyjohn) Yes, sir.

"THE COURT: Sergeant Uberta or Sergeant Gates, who was in charge of this investigation?

"SERGEANT GATES: Sergeant Uberta.

"THE COURT: All persons knowing themselves ot be witnesses herein raise your right hands. Do you and each of you solemnly swear that the evidence you are about to give will be the truth, the whole truth, and nothing but the truth, so help you, God?

"WITNESSES ANSWERED IN THE AFFIRMATIVE.

"QUESTIONS DIRECTED TO SERGEANT UBERTA BY THE COURT

"Q. Sergeant Uberta, you investigated this incident?

"A. Yes, Your Honor.

"Q. And what did you find out about it?

"A. On December seventeenth, 1966, this was on Saturday morning at four a.m., we were radioed to 1237 Linden Street, a report of two men shot. We found this location to be the residence of Harold J. Taylor. This was a two story dwelling and in the basement of this dwelling there was a divided partition, and in the entrance to this divided partition, we noted two white male subjects who were lying on the floor, both appeared to have been shot in the head; both were obviously dead. We called the Coroner, Dr. Robert Ransburg pronounced both victims dead and gave cause of death due to gunshot wound. We called the Identification Division and they took photos of the scene. Underneath one of the victims, who was tentatively identified at that time as James Wilbanks, we found what appeared to be a thirty-

eight caliber slug. It was lying underneath his body. This slug was discovered by Officer Phillips, who subsequently took it to the police property room. In the room there was what appeared to be a card table and it appeared that there had been a poker game in progress. We had conversation with witnesses. Subsequently on November sixth, 1967, at two twenty p.m. in the Arkansas State Penitentiary, I had a conversation with a Turner Lee Boles. This conversation was subsequently reduced to writing. At this time Turner Boles told me that he shot James Wilbanks.

"Q. Under what circumstances?

"A. They were in perpetration of a robbery of a poker game at that address and Mr. Wilbanks was with them at the time. He was the setup to gain entrance into the poker game. An argument ensued. Mr. Boles alleged that Wilbanks gave him a judo chop, knocking him to the ground and he subsequently shot him.

"Q. How about Samuel Monroe?

"A. Monroe was not a party of the setup, but was present there. Turner Boles denied shooting him and alleged that Pettyjohn shot Monroe.

"Q. What was the cause of death on Monroe?

"A. On Monroe, it was a perforating gunshot wound and cause of death was subdural hematoma.

"Q. Secondary to gunshot wound?

"A. That's right, Your Honor.

"Q. Did you take any other statements?

"A. I personally did not, Your Honor, but there were other statements taken.

"Q. *Sergeant Gates,* do you know about any other statements?

"A. (Sergeant Gates) I do believe there was a statement taken from Howard Soots by Sergeants Patton and Marcum.

"Q. *Sergeant Marcum,* did you take a statement here?

"A. (Sgt. Marcum) I haven't been sworn in yet.

"*THE COURT:* Raise your right hand. Do you solemnly swear that the evidence you are about to give will be the truth, the whole truth, and nothing but the truth, so help you, God?

"*WITNESS:* I do.

"Q. Did you take a statement here?

"A. (Sgt. Marcum) Yes, sir, I did. It was on November the twenty-eighth at eleven a.m. in the morning.

I talked to Howard Soots and he admitted his part in the shooting and being at the place and he reduced it to writing.

"Q. Did he say that the three were together in this enterprise, is that it?

"A. Yes, sir, he did.

"THE COURT: Mr. Blum, any questions?

"MR. BLUM: No questions.

"THE COURT: Mr. Melangton, any questions?

"MR. MELANGTON: No questions, Your Honor.

"THE COURT: At this time I accept the plea of the defendant Boles of guilty to the crime of second degree murder as covered by Count One of the indictment, and also I accept the plea of the defendants Soots and Pettyjohn to the crime of manslaughter as covered by the indictment. I order precommitment investigation in accordance with the statute and set this matter for pronouncement of judgment Thursday, December twenty-eighth at one thirty p.m.

"AND THAT WAS ALL OF THE EVIDENCE OFFERED AND INTRODUCED IN THE FOREGOING PROCEEDING.

* * *"

The appellant first contends that his plea was given under duress, because he feared that if he did not plead guilty he would be returned to prison in Arkansas where he allegedly had received harsh treatment at the hands of prison officials. Yet, at his post-conviction hearing, the appellant testified as follows:

"Q. And, of course, they did keep their word and they pardoned you or something over there, didn't they?

"A. I don't know. When [Governor Rockefeller] give me this letter he read it to me and told me that they could never bring me back if come back here and take trial.

"Q. I see. Now when you came back here, Turner, or when you started to be made to enter this plea of guilty, did you have any fear of what would happen to you if you didn't enter it, would they send you back?

"A. No, sir, because, like I say, Rockefeller said if I would stand trial for the charges that I had done here but I didn't stand trial, I just entered a plea.

* * *

"Q. Now when were you returned to Indiana?

"A. It must have been right close to December. I don't know just when, I believe sixty-seven.

"Q. Now this letter from Governor Rockefeller that you introduced is dated October twenty-fourth, 1967, does that refresh your recollection?

"A. That is as close as I—like I say, I can't remember the dates. I can't remember no dates.

"Q. Is that about when you come back, in the fall of sixty-seven?

"A. Right after, I suppose right after he wrote this letter I came back, about a week or something.

"Q. When were you pardoned in Arkansas?

"A. I don't know if I was ever pardoned really.

"Q. There is no detainer against you now, is there?

"A. No, sir.

"Q. So by coming back, as far as you know, the charges and convictions against you in Arkansas were just set aside, or at least you don't have to go back there, right?

"A. Yes, sir, according to that letter, that's the way I understood it.

\* \* \*"

Thus, the appellant's contention that his plea of guilty was entered under duress is not supported by the record. Pleading guilty in Indiana was not a condition precedent to a pardon in Arkansas. The Arkansas authorities merely released the appellant and commuted his sentence on the condition that he stand trial in Indiana.

The record discloses that the appellant was faced with a possible death sentence under a charge of first degree murder, (Burns § 10-3401), that through the process of "plea bargaining" such charge was reduced to second degree murder in exchange for a plea of guilty, that the appellant had admitted the killing in a signed confession, that the appellant's trial attorney testified that he had never pleaded a person guilty to a charge of murder without first informing him that the court had no power to suspend a murder conviction:

"Q. Did you ever tell Mr. Boles that he would not get a life sentence?

"A. I am pretty sure I didn't. I can't remember exactly

what I did tell him but I can't recall whether I told him that at sentencing or not. The only thing, if I may try to explain myself, in my opinion I told Turner to do what I thought was the right thing to do and we did discuss it and I think with everything involved here, I think he did agree with me that we would plead him guilty.

"Q. Didn't he do it, also knowing that he was going to get a life sentence?

"A. That I honestly can't tell you, I can't tell you because I know that murder in the first degree carries life sentence.

"Q. You know that murder in the second degree carries a life sentence, too?

"A. Yes.

"THE COURT: Used to.

"Q. Used to. Wasn't the plea bargain that you struck with Mr. Bath and Mr. Boles was to plead guilty to second degree murder which carries a life sentence in the State of Indiana?

"A. If that is what the record shows, that is true.

"Q. Well, that's in line with your recollection of it, isn't it?

"A. To the best of my recollection, that is the truth.

\* \* \*

"QUESTIONS BY THE COURT

"Q. They were permitted to do so by the State?

"A. I think that's right, Judge.

"Q. I mean the State consented to the plea?

"A. As far as I remember, Judge.

"Q. Of course, after your years of experience in the practice of criminal law, you were well aware of the fact that no Court has the power to suspend a murder conviction?

"A. Yes, sir.

"Q. Have you ever in your life pleaded a person guilty to murder when you did not let him know that?

"A. No, sir."

We agree with the trial court that the appellant wholly failed in his burden of showing that his guilty plea was not voluntarily entered. We find nothing herein to overcome the presumption that the trial court acted properly in denying appellant's petition. *Lockhart* v. *State* (1971), 257 Ind. 349, 274 N. E. 2d 523. As stated by the Supreme Court in *Brady*

v. *United States* (1970), 397 U.S. 742, 749, 90 S. Ct. 1463, 1469:

> "The State to some degree encourages pleas of guilty at every important step in the criminal process. For some people, their breach of a State's law is alone sufficient reason for surrendering themselves and accepting punishment. For others, apprehension and charge, both threatening acts by the Government, jar them into admitting their guilt. In still other cases, the post-indictment accumulation of evidence may convince the defendant and his counsel that a trial is not worth the agony and expense to the defendant and his family. All these pleas of guilty are valid in spite of the State's responsibility for some of the factors motivating the pleas; the pleas are no more improperly compelled than is the decision by a defendant at the close of the State's evidence at trial that he must take the stand or face certain conviction."

Furthermore, the voluntariness of a guilty plea is not rendered constitutionally defective merely because a criminal defendant denies commission of the crime charged. *North Carolina* v. *Alford* (1970), 400 U.S. 25, 91 S. Ct. 160. The factors which motivated the appellant to plead guilty are not material, so long as we can ascertain from the record that his guilty plea was entered freely, voluntarily and knowingly. *Brady* v. *United States, supra; Boykin* v. *Alabama* (1969), 395 U.S. 238, 89 S. Ct. 1709. In *Alford, supra,* the Court stated:

> "Thus, while most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.
> "Nor can we perceive any material difference between a plea that refuses to admit commission of the criminal act and a plea containing a protestation of innocence. when, as in the instant case, a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt. Here the State had a strong case of first-degree murder against Alford. Whether he realized or disbelieved

his guilt, he insisted on his plea because in his view he had absolutely nothing to gain by a trial and much to gain by pleading. Because of the overwhelming evidence against him, a trial was precisely what neither Alford nor his attorney desired. Confronted with the choice between a trial for first-degree murder, on the one hand, and a plea of guilty to second-degree murder, on the other, Alford quite reasonably chose the latter and thereby limited the maximum penalty to a 30-year term. When his plea is viewed in light of the evidence against him, which substantially negated his claim of innocence and which further provided a means by which the judge could test whether the plea was being intelligently entered, see McCarthy v. United States, supra, at 466-467, 22 L. Ed. 2d at 425, 89 S. Ct. 1166 (1969), its validity cannot be seriously questioned. In view of the strong factual basis for the plea demonstrated by the State and Alford's clearly expressed desire to enter it despite his professed believe in his innocence, we hold that the trial judge did not commit constitutional error in accepting it.

"Relying on United States v. Jackson, supra, Alford now argues in effect that the State should not have allowed him this choice but should have insisted on proving him guilty of murder in the first degree. The States in their wisdom may take this course by statute or otherwise and may prohibit the practice of accepting pleas to lesser included offenses under any circumstances. But this is not the mandate of the Fourteenth Amendment and the Bill of Rights. The prohibitions against involuntary or unintelligent pleas should not be relaxed, but neither should an exercise in arid logic render those constitutional guarantees counterproductive and put in jeopardy the very human values they were meant to preserve." 400 U.S. at 37-39.

We agree with the rationale hereinabove quoted, but we do not imply that Indiana courts should depart from close judicial scrutiny of guilty pleas. A guilty plea amounts to an admission of the crime charged. *Batchelor* v. *State* (1920), 189 Ind. 69, 125 N. E. 773. Therefore, where a guilty plea is accompanied with a protestation of innocence and unaccompanied by evidence showing a factual basis for guilt, the trial court should never accept it. But where, as in the case at bar, the plea is accompanied with overwhelming evidence of the defendant's guilt, the defendant

is judicially advised of all the rights he is waiving, and the plea is voluntarily, freely, and knowingly given, then the subjective motivation behind such plea shall not render it defective. Subsequent contentions of innocence arising during post-conviction relief proceedings are not sufficient, nothing more appearing, to attack a previously entered plea of guilty.

Appellant further asserts error in that the indictment returned by the grand jury charged him with a murder committed on December 17, 1967, a date in the future. The trial court permitted the indictment to be amended to change the date of the alleged murder to December 17, 1966. No motion to quash the indictment was filed, nor was any objection forthcoming when the State filed its motion to amend by interlineation. Appellant has failed to show that he was prejudiced in the least by the trial court's action. The indictment was corrected prior to the entering of appellant's guilty plea and was a correction of form, not substance. Appellant's contention is without merit. *Johnson* v. *State* (1972), 258 Ind. 383, 281 N. E. 2d 473. Likewise meritless is the contention that the trial court lacked subject matter jurisdiction to proceed after the faulty indictment was filed. IC 1971, 35-1-23-26, 35-4-4-1, Ind. Ann. Stat. §§ 9-1127, 9-1133 (1956 Repl.); cf., *Robbins* v. *State* (1968), 251 Ind. 313, 241 N. E. 2d 148.

The judgment of the trial court is hereby affirmed.

Arterburn, C.J., concurs; Givan, J., not participating; DeBruler, J., dissents with opinion in which Prentice, J., concurs.

### DISSENTING OPINION

DeBruler, J.— Appellant's appeal from the denial of his post-conviction petition is based on two separate and distinct contentions: (1) That his guilty plea was entered into under coercion because of alleged abusive treatment in prison, and (2) that it was entered into without adequate knowledge of its consequences because appellant was not fully aware of the special sentencing provisions to which his plea exposed him.

The majority opinion has extensively dealt with the first of these issues and I agree with the conclusion reached with respect to it. The opinion does not deal so specifically with the second issue, but apparently the majority has decided either that appellant need not have been aware of the sentencing provisions when he entered his plea or that there exists evidence in the record which creates a reasonable inference that he was aware of the provisions. I cannot agree with this resolution of appellant's second contention and I therefore dissent.

A defendant's decision to plead guilty to a criminal charge lodged against him is the most sweeping and encompassing step he may make in our criminal system.

> "A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment." *Boykin* v. *Alabama* (1969), 395 U.S. 238, 242, 89 S. Ct. 1709, 23 L. Ed. 2d 274.

It is estimated that pleas of guilty now account for over 90% of the criminal convictions every year in this country.[1] I believe that because of the increasingly widespread use of this method to dispose of the important issues and questions more traditionally and thoroughly treated at trials we must be particularly careful that the plea entered has been done so in accordance with constitutional standards.

> "Because of the grave nature of a guilty plea the trial court has a duty to closely scrutinize the situation and be sure that the offered plea is freely and understandingly given. . . ." *Brimhall* v. *State* (1972), 258 Ind. 153, 279 N. E. 557, 563; *Harshman* v. *State* (1953), 232 Ind. 618, 115 N. E. 2d 501; *Campbell* v. *State* (1951), 229 Ind. 198, 96 N. E. 2d 876.

It has long been established that in order for a guilty plea to be constitutionally valid it must be made, "voluntarily after proper advice and with *full understanding of*

---

1. Erickson, "The Finality of a Plea of Guilty", 48 N. Dame Lawyer 835 (1973).

*consequences.*" (Emphasis added.) *Machibroda* v. *U.S.* (1962), 368 U.S. 487, 82 S. Ct. 510, 7 L. Ed. 2d 473; *Kercheval* v. *U.S.* (1927), 274 U.S. 220, 47 S. Ct. 582, 71 L. Ed. 1009; *Brown* v. *State* (1973), 261 Ind. 50, 300 N. E. 2d 83. It is axiomatic that the possible sentences a defendant subjects himself to, through his plea, is contemplated as a "consequence" in the meaning of this constitutional rule. *Marvel* v. *U.S.* (1965), 380 U.S. 262, 85 S. Ct. 953, 13 L. Ed. 960 (Per Curiam).

Appellant alleges that he entered his plea on the offense with the belief that the sentencing judge would subsequently hear appellant's version of the offense, which appellant believed would disclose mitigating circumstances, and that the judge might then sentence him to a lesser sentence than the maximum of which he had been informed. At the post-conviction hearing the court itself inquired of appellant's understanding of the sentencing procedures which were to be employed after his plea of guilty.

"Q. (By Court) You didn't understand you were pleading guilty when you were pleading guilty?

A. Yessir, I understood I was pleading guilty but I was pleading guilty and you were to hear, the way I understood it was to hear the evidence. You were to hear my story and you was to hear everyone else's story and then you would decide whether I would get a life sentence or cut loose or what. That was the understanding that I had.

Q. You knew you were pleading guilty?

A. Yesser, I knew I was pleading guilty.

Q. You understood what a plea of guilty was?

A. Well I went in front of Mr. Rabb and I pleaded guilty.

Q. You have done it before?

A. I pleaded guilty in front of him and then he heard all the statements and everything and then he sentenced me to five months.

Q. Well you understood what a plea of guilty was at the time you entered didn't you?

A. Not according to this I didn't because I thought that I would get to be heard. I didn't get to be heard. I entered a plea and you sent me across the street, you brought me back across the street and you sentenced me

and sent me to the penitentiary for life. You didn't hear one word that I had to say at all other than my pleading guilty."

Appellant contends that it was not until after he was sentenced that he discovered that there existed certain sentencing provisions for a second degree murder conviction which made a life sentence mandatory.

It is agreed that the penalty for second degree murder at the time appellant was sentenced was a mandatory life term. Burns § 10-3404.[2] In addition to the murder statute itself, another statute (IC 1971, 35-7-1-1, being Burns § 9-2209) listed second degree murder as one of only a few crimes in this State where the sentencing judge was prohibited from exercising his usual discretion in matters of sentencing. Unlike the judge's power in most situations the judge under a § 9-2209 conviction had no power to suspend the sentence or parole the defendant; the imposition of a life sentence was mandatory. *State ex rel. Palmer* v. *Cir. Court of Hendricks Co.* (1963), 244 Ind. 297, 192 N. E. 2d 625; *O'Neil* v. *State* (1939), 216 Ind. 21, 22 N. E. 2d 825.

The initial question, therefore, is whether it was necessary for appellant to be apprised of the somewhat unique sentencing provisions of the 1967 second degree murder statute, by which he was barred from receiving a suspended sentence and imposition of a life sentence was statutory mandated, in order to have a complete and full understanding of the sentencing consequences of this plea as required by the Constitution. I believe that it would be.

These special sentencing provisions have a direct affect on appellant's right to parole and a possible suspension of sentence. Appellant's post-conviction testimony indicates that at least part of his decision to enter his plea, and thereby waive several significant rights, was grounded on the mistaken belief that the judge was empowered to sentence him to less

2. In 1969 the Indiana General Assembly amended the statute to provide an alternative sentence of 15-25 years.

than the maximum. This belief was fostered by his previous pleas of guilty after which he apparently had been afforded an opportunity to explain his version of the offense which, he felt, resulted in a less severe sentence. It could also be argued that the judge's use of the term "maximum penalty" when informing the appellant of the sentence he could receive might enforce, however, unintentionally, appellant's belief that there did indeed exist a minimum sentence or at least an alternative to the "maximum" about which he had been informed. Appellant entered his plea with the expectation that the judge would exercise discretion in sentencing. In order for appellant to make a fully informed choice on the decision to plead guilty he should have been informed that the judge had no such discretion.

The principle that a full understanding of the consequences requires that a defendant should be fully informed of all relevant facts concerning the possible sentences he may receive upon his plea has received wide recognition. The Indiana General Assembly in its past session enacted the Indiana Code of Criminal Procedure which sets out the type of information which a defendant must be aware of in order for his plea of guilty to be properly accepted. At § 3 of that Code it requires the defendant to be informed of "the maximum possible sentences and minimum sentences of the offense charged and of any possible increased sentences by reason of the fact of a prior conviction or convictions, and of any possibility of the imposition of consecutive sentences." P. L. 325, Art. 4.1, § 3 (d). In addition the ABA standards relating to pleas of guilty require that a defendant be advised of the maximum possible sentence on the charge, and the "mandatory minimum sentence" if any. *Standards, Pleas of Guilty,* § 1.4 (c).

I want to emphasize that my position here does not require that a defendant seeking to enter a plea of guilty to a charge must be told of the exact sentence a judge would impose upon him if the plea was accepted. Nor does it mean that a de-

fendant who had been properly and fully informed of the possible sentences which could be imposed on him should be allowed to withdraw his plea merely because he was disappointed in the severity of the sentence he was ultimately given. It merely recognizes that in order for a plea to be made with knowledge of its consequences a defendant should be made aware of the "range of sentences" to which the plea exposes him.

Moreover this does not require that an accused need be informed prior to the acceptance of his guilty plea about every conceivable collateral effect the conviction entered on the plea might have. See *Bye* v. *U.S.* (2d Cir., 1970), 435 F. 2d 177. However when there exists a condition imposed by a statute such as here which has a direct and definite consequence on a disposition of a defendant's plea I believe he must be apprised of it in order that he be allowed to exercise an informed choice on his decision to waive the important constitutional rights afforded to him. *Bye* v. *U.S., supra; Jenkins* v. *U.S.* (10th Cir., 1970), 420 F. 2d 433; *Berry* v. *U.S.* (3rd Cir., 1969), 412 F. 2d 189; *Durant* v. *U.S.* (1st Cir., 1969), 410 F. 2d 689; *Munich* v. *U.S.* (9th Cir., 1964), 337 F. 2d 356. The knowledge of the mandatory nature of this sentence is as necessary to a full understanding of the consequences as is the knowledge of the maximum sentence iself.

The extent of the guilty plea transcript set out in the majority opinion is impressive in bulk and it is beyond question that the trial judge properly informed appellant of his right to trial by a jury, his right to remain silent at the trial if he so desired, his right to cross examine the State's witnesses, his right to call witnesses and introduce evidence on his own behalf, his right to appeal an unfavorable decision and his right to have counsel throughout the course of these proceedings. However, I do not believe that compliance with some, or even most, of the requirements for a constitutionally valid guilty plea should excuse us from requiring compliance with all of them, and a full understanding of the sentence to which

a plea will expose a defendant is clearly constitutionally necessary.

Furthermore, I cannot agree with the apparent implication in the majority opinion that the testimony of appellant's trial attorney to the effect that, "he had never pleaded a person guilty to a charge of murder without first informing him that the court had no power to suspend a murder conviction" can be sufficient to show that appellant was indeed aware of the unique sentencing provisions. That same attorney also testified in conjunction with appellant's particular case that he could not remember what he told appellant, and that he honestly could not tell whether appellant was aware of the mandatory sentence when he entered his plea. The broad generalization of the first statement, which apparently pertains to every guilty plea proceeding this attorney ever appeared in, cannot reasonably be construed to establish what is specifically denied in the later testimony directed to appellant's particular plea proceeding. *Campbell* v. *State, supra.*

Since I believe a full understanding of the sentencing consequences of his plea is required for a constitutionally valid plea, and since appellant has presented a prima facie case establishing that he was not so informed, which the State has failed to reasonably rebut, I would vote to reverse the judgment of the trial court.

Prentice, J., concurs.

NOTE.—Reported in 303 N. E. 2d 645.